J-A04044-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM CLEGG | : | |
| | : | |
| Appellant | : | No. 2292 EDA 2022 |

Appeal from the Judgment of Sentence Entered August 15, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008964-2018

BEFORE:   STABILE, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED SEPTEMBER 13, 2024**

Appellant, William Clegg, appeals from the judgments of sentence that the Court of Common Pleas of Philadelphia County imposed after a jury found him guilty of rape by forcible compulsion, rape by threat of forcible compulsion, unlawful contact with a minor, aggravated indecent assault of a person less than sixteen years old, and statutory sexual assault.[1]  The charges in this matter were based on allegations of sexual abuse of Appellant's thirteen-year-old daughter, L.L.  On direct review, Appellant challenges, *inter alia*, the sufficiency of the evidence supporting his rape and unlawful contact convictions, the admission of prior bad acts evidence, and the trial court's refusal to admit evidence and permit cross-examination concerning the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3121(a)(1), 3121(a)(2), 6318(a)(1), 3125(a)(8), and 3122.1(b), respectively.

presence of sperm and DNA from males other than himself on the victim's pajama pants and bedsheet.  Upon careful review, we affirm.

As of 2018, L.L. was living with Appellant, her mother, her younger two brothers,[2] and an uncle on Trenton Avenue in Philadelphia.  N.T. 10/21/21, 73-77.  On the weekend of October 7, 2018, L.L. was staying at a campground in Chester County along with Appellant, her mother, her brothers, her aunt, and her aunt's boyfriend.  *Id.* at 79-80, 193; N.T. 10/22/21, 96.  On the Saturday night of that weekend, while they were all staying together in a camper trailer, L.L.'s parents got into a fight and her mother "drove off angry." N.T. 10/21/21, 82; N.T. 10/22/21, 7.  Afterwards, Appellant encouraged L.L. to go to sleep with him in her parents' bedroom in the trailer.  N.T. 10/21/21, 82.  After falling asleep there next to her baby brother and Appellant, L.L. woke up to feeling someone's hands in her shorts, touching her vagina.  *Id.* at 82-83.  L.L. laid on her back in shock with her eyes closed until the touching episode was over.  *Id.* at 84.  Eventually she opened her eyes and saw Appellant.  *Id.* at 85.  In the morning, L.L. did not tell anybody about what had happened to her and "thought maybe it was like a bad dream." *Id.*  L.L. subsequently knew that she did not dream the incident at the campground after "[i]t happened several times after that" in their home in Philadelphia. *Id.* at 85-86.

---

[2] One brother was eleven years old, and the other was around eleven months old.  N.T. 10/21/22, 76-77.

A few days after the campground incident, L.L. again woke up to a hand in her pants, touching her vagina with their fingers. N.T. 10/21/21, 86-88. She tried to pretend that she was asleep and rolled around "to maybe get it to stop." *Id.* at 86. L.L. rolled into a "planking position" with her stomach and chest on the bed and her elbows tucked under her chest. *Id.* at 88. As before, L.L. had her eyes closed while the contact was happening. *Id.* After the touching on her vagina stopped for a few seconds, she felt a weight on top of her, "somebody like moving," and the bed was moving. *Id.* Before the touching on her vagina, L.L. also felt groping or squeezing of her breasts by a hand underneath her shirt. *Id.* at 91. After the vaginal touching, she felt a penis was pressed and being rubbed against her vagina. *Id.* at 89, 92. Nothing was said to her, and she did not say anything as she "was trying to create the impression that [she] was asleep." *Id.* at 89-90. After it felt like no one was there with her, she looked and saw Appellant in the doorway of her room, walking out of the room. *Id.* at 90, 92. L.L. had originally been wearing underwear or pajama pants and a shirt when she went to bed that night but, when she woke up, she was no longer wearing any bottoms or underwear. *Id.* at 90-91.

L.L. recalled that similar incidents in question occurred "about four to five" times "all throughout the month of October."[3] N.T. 10/21/21, 93-94. In

_____

[3] With respect to at least one of the incidents at the Trenton Street home, L.L. recalled that, while she was in a planking position, the person rubbing his
*(Footnote Continued Next Page)*

a third incident that she recalled, she again woke in her bed with a hand in her pants and went into a "planking position." *Id.* at 94-95. After this incident ended, she saw Appellant wearing only a pair of boxer shorts. *Id.* at 95-96.

L.L. did not tell anyone about the incidents immediately after they occurred and instead later wrote in her eighth-grade English class about waking up in the middle of the night and started crying in the classroom. N.T. 10/21/21, 97. She was excused from the class with three friends and then told the friends in the school hallway about "what was happening at [her] house at night." N.T. *Id.* at 98; N.T. 10/25/21, 136-143. After the encouragement of her friends, L.L. told her mother about "what happened" when her mother picked her up at school that day. N.T. 10/21/21, 99. She told her mother "about being touched at night by Bill," which is how she referred to Appellant. *Id.* L.L. and her mother went home and talked "about it" with a neighbor who was a close friend to L.L.'s mother. *Id.* L.L.'s mother decided to then mention something about L.L. not "feeling well down" in her private area and "getting pains," to see how Appellant would react. *Id.* at 99-100. After the mother followed through with that plan, Appellant told her that "it might be a yeast infection," and that she "might want [to] go get that checked out at a hospital." *Id.* at 100-101. Appellant later mentioned to L.L.

_____

penis on her vagina had separated her legs with his foot. N.T. 10/22/21, 18, 37. L.L. mother's repeated L.L.'s assertion about that in her own police statement. *Id.* at 130 ("That he would, like, lay in bed with her and spread her legs with his leg. He moved his leg to move her leg over to open her legs. I believe at one point, he did try to have his penis down there and insert it."); *see also* N.T. 10/26/21, 17 (related stipulation).

that he heard that she was not feeling well but she said nothing to him before then going to bed. *Id.* at 101.

On the next day, October 30, 2018, L.L., her mother, her younger brother, and the neighbor they had spoken with, went to the police station together to make a report of "what was happening." N.T. 10/21/21, 101, 132-133; N.T. 10/22/21, 9, 117. L.L. and her mother spoke with police officers at a local precinct station and the Special Victims Unit and then L.L. was taken to Children's Hospital in Philadelphia, where a rape kit exam was performed on her. N.T. 10/21/21, 101-102; N.T. 10/22/21, 53-60, 117-121, 128-130; N.T. 10/25/21, 174-177, 182-184. The police subsequently executed a search warrant at the victim's home, took photographs of her bedroom, and recovered a sheet from the victim's bed and a pair of her pajamas that were on the bed. N.T. 10/25/21, 178-182. Appellant turned himself over to the police on October 31, 2018. N.T. 10/22/21, 156-157; N.T. 10/25/21, 188.

L.L.'s mother later asked her after school one day to write a letter relating that she had lied about the reported incidents, she was "really sorry," and did not want to get in trouble. N.T. 10/21/21, 105; N.T. 10/22/21, 193. On December 6, 2018, L.L. complied with the request, writing out a letter dictated by her mother. N.T. 10/21/21, 105-107, 148, 155; 10/22/21, 141. The next day, L.L.'s mother took her to a meeting with an investigator at a law firm representing Appellant to whom she gave the letter. N.T. 10/21/21, 111-112, 149-55; N.T. 10/22/21, 138-140, 143-144. In a video-taped interview with police in January 2019, L.L.'s mother admitted that she had her

daughter write the recantation letter, she had it notarized, and she had taken it to an attorney.[4]  N.T. 10/22/21, 154-156; N.T. 10/25/21, 190-195.  She also divulged that Appellant had her write the letter.  N.T. 10/25/21, 195.

In December 2018, L.L. moved in with a guardian along with her two brothers.  N.T. 10/21/21, 113-114.  She was told that this arrangement occurred because "it was an unsafe environment at the time, and [her] mother needed to get checked somewhere;" L.L. addressed at trial that her mother had been "drinking pretty heavily at that time" and "had threatened to kill herself."  *Id.* at 114, 211; **see also** N.T. 10/22/21, 146-147.  On December 18, 2018, L.L. told a DHS worker that her mother made her write the recantation letter and about going to an attorney's office.  N.T. 10/22/21, 32.  She stayed with the guardian until the end of 2019, at which time she moved in with one of her friends before returning to live with her mother and her brothers at her grandmother's home.  N.T. 10/21/21, 114-115; N.T. 10/25/21, 159-160.

L.L.'s mother had a ten-day stay in a hospital in December 2018 to deal with mental health issues and depression.  N.T. 10/22/21, 146-152.  After being discharged, she received a letter from Appellant stating,

> To my wife … I was told [L.L.] told her DHS person you put her up to writing that letter, please don't say you did.  That you can bring me home and move ASAP to [Appellant's sister's].  Please don't

---

[4] The letter stated: "To whom it may concern, I'm sorry I lied.  William Clegg did not touch me.  I was very mad and upset at the time and now I'm scared.  I didn't want to get in trouble. … P.S. I'm truly sorry.  I did not think it would go this far."  N.T. 10/21/21, 148-149.

tell them you put her up to it and flush this letter after you read it.

*Id.* at 152-153. L.L.'s mother provided this letter to the police. *Id.* at 153-154.

A sample of the bed sheet that was collected from L.L.'s bed on October 30, 2018 (referred to as sample "2C"), was subjected to forensic examination and determined to have contained semen with a DNA mixture of at least two individuals, one of whom was male. N.T. 10/25/21, 15-19, 62-64. The major component of the DNA mixture from the source was consistent with a DNA profile obtained from Appellant and, due to insufficient data, there was not enough information to determine if L.L.'s DNA was also on the sample. *Id.* at 62-63. There was no male DNA detected on the swabs taken during L.L.'s rape kit examination. *Id.* at 73-74.

The Commonwealth filed a pre-trial motion seeking to admit evidence concerning the campground incident and prior instances of physical abuse that were witnessed by L.L. where Appellant had struck L.L.'s younger brother, grabbed L.L. by her shoulder, and had thrown a power drill that contacted L.L. after it hit a coffee table. Commonwealth Motion to Admit, 1/11/20, 3-5. The Commonwealth sought the admission of the prior physical abuse incidents to demonstrate that a "climate of fear" explained why L.L. did not immediately reveal the sexual abuse committed by Appellant. *Id.* at 9-10. It sought admission of the out-of-county campground incident to establish "the natural history of the case." *Id.* at 10-11. After bifurcated arguments, the court

granted the admission of the evidence concerning the camping incident and the prior incidents of physical abuse. N.T. 2/11/20, 4-5, 22-24.

Appellant proceeded to be tried before a jury on October 20-28, 2021. L.L. testified consistent with the above summary of the facts. Her mother confirmed L.L.'s report to her that Appellant had "been touching" L.L. and the circumstances of their visit to the police station, the Special Victims Unit, and the hospital. N.T. 10/22/21, 106-109, 116-121, 128-129. L.L.'s mother agreed that Appellant asked her to have L.L. write the letter saying that she lied about the abuse, she wrote a letter for L.L. to copy, and Appellant told her what to write in the letter. *Id.* at 124-125, 127, 137-138. L.L.'s mother admitted at trial that she felt bad and guilty "for making [L.L.] write that letter." *Id.* at 146-147, 156. In addition to presenting the testimony of L.L. and her mother, the Commonwealth presented testimony from a forensic scientist who is an expert in the field of trace analysis (Jaleela Harp), two experts in the field of DNA analysis (Lynn Haimowitz and Ruifan Kubiak), one of L.L.'s classmates that heard her first report about Appellant inappropriately touching her (M.R.), and the police officer that interviewed L.L. and her mother at the Special Victims Unit (Officer Toni Madgey).

Defendant declined to testify. N.T. 10/26/21, 30-35. He presented testimony from his half-sister, Tara Willassen, concerning the campground trip on the weekend of October 7, 2018. *Id.* at 38-60. She testified that it was a "pretty peaceful night once everybody pretty much just settled down," she did not know where L.L. was when she went to her room in the camper, Appellant

and his infant son were together in the master bedroom, she saw two bodies on a futon on the camper once in the middle of the night when she went to the bathroom, and that L.L. was on the futon when she woke up on the morning after the inappropriate touching incident that allegedly occurred. *Id.* at 54-55, 58-59, 63-66.

In closing arguments, the defense focused the jury on the presumption of innocence, the credibility of L.L.'s account (addressing, *inter alia*, her failure to mention the campground incident at the time she first spoke to the police and the fact that her initial reports alleged touching of her private parts while the full account included attempted vaginal intercourse), and the potential possibility that Appellant's sperm was transferred to L.L.'s bedsheet through being washed in the laundry.

The jury found Appellant guilty of the above-referenced offenses. N.T. 10/28/21, 14-16; Verdict Report, 10/28/21, 1-2. On August 15, 2022, the court sentenced Appellant to an aggregate imprisonment term of fourteen to twenty-eight years, to be followed by five years' probation.[5] Sentencing Order, 8/15/22, 1-2; N.T. 8/15/22, 35-36. Appellant timely filed a notice of appeal. Notice of Appeal, 9/9/22. The trial court ordered Appellant to file a concise statement of errors pursuant to Pa.R.A.P. 1925(b). Rule 1925 Order,

_____

[5] The aggregate term included concurrent terms of nine to eighteen years' imprisonment for each of the rape convictions, a consecutive term of five to ten years' imprisonment for statutory sexual assault, a concurrent term of nine to eighteen years' imprisonment for unlawful contact, and the five-year probation term for aggravated indecent assault. Sentencing Order, 8/15/22, 1-2; N.T. 8/15/22, 35-36.

- 9 -

10/28/22, 1. Appellant filed a request for an extension of the deadline for filing a Rule 1925(b) statement on the original deadline set by the trial court and then filed a Rule 1925(b) statement three days later. Rule 1925 Extension Request, 11/18/22, 1-2; Rule 1925(b) Statement, 11/21/22, 1-2. No order was filed in response to the extension request and no Rule 1925 opinion was filed as the trial jurist was no longer sitting as a judge in the Philadelphia County Court of Common Pleas. Trial Court Correspondence, 11/21/22, 1.

Appellant presents the following questions for our review:

1. Should not the statement of errors complained of on appeal be deemed timely in the instant matter where defense counsel, due to extenuating circumstances, made a timely request for an extension of time, where the extension of time requested was minimal and did not interfere with the orderly progression of the instant appeal, where a statement of errors was then filed within the extension period requested, and where the record of the case was forwarded to the appellate court without the trial court ruling on the extension request or writing a Rule 1925(a) opinion?

2. Was not the evidence insufficient to prove beyond a reasonable doubt the offenses of rape by forcible compulsion or threat of forcible compulsion in that the evidence failed to prove forcible compulsion or threat of forcible compulsion?

3. Was not the evidence insufficient to prove beyond a reasonable doubt the offense of unlawful contact with a minor in that the evidence failed to prove that Appellant was intentionally in contact with the minor complainant for the purpose of engaging in the commission of the sexual offenses with which Appellant was charged?

4. Did not the pre-trial hearing court err and abuse its discretion by admitting evidence of prior bad acts consisting of alleged incidents of physical abuse by Appellant (grabbing complainant's shoulder, punching complainant's brother and

- 10 -

throwing a drill) for the purpose of explaining the complainant's purported delay in reporting alleged sexual assaults where the complainant never expressed fear of reporting nor was it alleged that the complainant actually had such fear due to the prior incidents of physical abuse, where the assaults were reported while ongoing and any delay in reporting was minimal, where the prior bad acts were too infrequent and attenuated to establish actual fear of reporting by the complainant, and where the probative value of the prior bad acts was outweighed by a danger of unfair prejudice to the Appellant?

5. Did not the trial court err and abuse its discretion by prohibiting introduction of evidence of, or cross-examination as to, DNA collection testing indicating, *inter alia*, the presence of sperm not from Appellant and DNA of males other than Appellant found on the complainant's clothes and bedclothes?

Appellant's Brief at 4-5 (claims reordered for organizational purposes).

As a preliminary matter, we must first address Appellant's claim about his compliance with Pa.R.A.P. 1925(b). Appellant asserts that he was unable to comply with the original deadline set for the filing of a court-ordered Rule 1925(b) statement because of "a late and unexpected reschedule of [his] counsel's wife's chemotherapy treatment," for which counsel needed to be available to transport his wife. Appellant's Brief at 65. He acknowledges that his counsel filed a request for an extension of time to file a Rule 1925(b) statement within the original deadline set by the trial court and filed a Rule 1925(b) statement within the extended deadline sought by his request for leave of court. *Id.* He asks that we not find his claims waived because the failure to satisfy the original filing deadline was "due to extenuating circumstances," the delay in the filing of his Rule 1925(b) statement was

minimal, and the delay had no effect on the production of a trial court opinion where none was ever filed. *Id.* The Commonwealth also declines to make an objection asserting that the Rule 1925(b) statement was untimely filed. Appellee's Brief, 22.

The lower court may enlarge the time period for filing a Rule 1925(b) statement "[u]pon application of the appellant and for good cause shown." Pa.R.A.P. 1925(b)(2)(i). "[W]hen an appellant timely files for an enlargement or extension of time within which to file his Rule 1925(b) statement, the trial court must explain why it finds that good cause was not shown before it may deny the request." *Commonwealth v. Hopfer*, 965 A.2d 270, 271 (Pa. Super. 2009). In this instance, there was no ruling on Appellant's request for an extension of the Rule 1925(b) statement filing period. In *Hopfer*, this Court determined that the relief for a trial court's denial of a motion for an extension of time to file a Rule 1925(b) statement without providing any analysis as to the appellant's justification for needing the extension was a remand "for the proper filing of a Rule 1925(b) statement and Rule 1925(a) opinion." *Id.* at 274. A remand, as dictated by *Hopfer*, however, would suit no purpose at this time as the jurist who originally sat as the trial court is no longer sitting as a judge for the lower court and is unable to opine as to her consideration, if any, on Appellant's extension request, and issue a Rule 1925(a) opinion. Accordingly, based on the apparent breakdown in court process that occurred when the trial court never ruled on Appellant's Rule 1925(b) statement extension request before leaving the court, we decline to

find waiver based on an untimely concise statement of errors complained of on appeal.

Given that the remaining issues on appeal and the trial court's consideration of them is apparent from the face of the record, we need not remand for the filing of an opinion since we are not precluded from meaningful review. *See Commonwealth v. Hood*, 872 A.2d 175, 178 (Pa. Super. 2005) (proceeding to substantive review in the absence of a Rule 1925(a) opinion; noting that the purpose of Rule 1925(a) is to provide our Court with a statement of reasons for the order entered in the lower court "to permit effective and meaningful review of the lower court['s] decisions" and "the lack of a Rule 1925(a) opinion is not always fatal to our review, because we can look to the record to ascertain the reasons for the order") (citation omitted).

We next turn to Appellant's challenges to the sufficiency of the evidence as a grant of relief on those claims would limit the scope of any trial that may be granted on the remaining claims addressing evidentiary admission issues. *See Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013) (*en banc*) ("Because a successful sufficiency of the evidence claim warrants discharge on the pertinent crime, we must address this issue first."). For each of these claims, we note our well-settled standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In

addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on more than mere suspicion or conjecture the Commonwealth need not establish guilt to a mathematical certainty.

*Commonwealth v. Brockman*, 167 A.3d 29, 38 (Pa. Super. 2017) (citation omitted).

Appellant argues that the evidence was insufficient for the rape convictions because, where it failed to show that he would have known that L.L. was awake at the time of the various incidents of abuse, "no threats were actually made" to compel the victim to submit to him, and "the degree of force allegedly employed by [him] to effectuate the sexual contact did not rise to the level necessary for forcible compulsion." Appellant's Brief at 49. The Commonwealth maintains that "the evidence showed that he used both physical and p[s]ycological force to compel the victim to engage in sexual intercourse against her will." Appellee's Brief at 17.

Appellant was convicted of rape under separate subsections addressing the engagement of sexual intercourse with a complainant "[b]y forcible compulsion" and "[b]y threat of forcible compulsion that would prevent resistance by a person of reasonable resolution." 18 Pa.C.S. § 3121(a)(1)-(2). "Sexual intercourse," in this context, is defined as, "[i]n addition to its ordinary meaning, includ[ing] intercourse per os or per anus, with some penetration however slight; emission is not required." 18 Pa.C.S. § 3101. "Forcible compulsion" is defined as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." *Id.*

Appellant asserts that, because the rape subsections he was convicted under required that he had forced the victim to engage in sexual intercourse against her will, they could only apply to a situation involving a conscious victim and the evidence was insufficient where there was no evidence that he would have known that the victim was not asleep. Appellant's Brief at 49. He argues that he "cannot be found to have employed forcible compulsion to rape the complainant," no threats of forcible compulsion "were actually made," and "the degree of force allegedly employed by [him] to effectuate the sexual contact did not rise to the level necessary for forcible compulsion." *Id.* We do not agree that the evidence is insufficient to prove his rape convictions.

With respect to the § 3121(a)(1) conviction, we note that "[t]he degree of force required to constitute rape … is relative and depends upon the facts and particular circumstance of the case." ***Commonwealth v. Rhodes***, 510

- 15 -

A.2d 1217, 1226 (Pa. 1986) (citation omitted). A determination on whether there is sufficient evidence to demonstrate beyond a reasonable doubt that an accused engaged in sexual intercourse by forcible compulsion or threat of forcible compulsion includes a weighing of a non-exhaustive list of factors including:

> the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.

*Id.*

In *Rhodes*, the defendant was a twenty-year-old neighbor of the eight-year-old victim, who knew the victim for several years and lured the victim to an abandoned building and proceeded to engage in sexual acts with the victim "to the extent that she was bleeding and torn." 510 A.2d at 1227. In finding the evidence was sufficient for forcible compulsion, our Supreme Court noted:

> There is an element of forcible compulsion, or the threat of forcible compulsion that would prevent resistance by a person of reasonable resolution, inherent in the situation in which an adult who is with a child who is younger, smaller, less psychological and emotionally mature, and less sophisticated than the adult, instructs the child to submit to the performance of sexual acts. This is especially so when the child knows and trusts the adult. In such cases, forcible compulsion or the threat of forcible compulsion derives from the respective capacities of the child and the adult sufficient to induce the child to submit to the wishes of the adult ("prevent resistance"), without the use of physical force or violence or the explicit threat of physical force or violence.

*Id.* at 1227.

Proof of forcible compulsion does not require evidence that the victim resisted. *Rhodes*, 510 A.2d at 1227 n.14 (*citing* 18 Pa.C.S. § 3107). "The inquiry is whether the defendant's physical, intellectual, moral, emotional, or psychological force compelled the victim to submit to intercourse against the victim's will, not whether the victim resisted the compulsion. *Commonwealth v. Banniger*, 303 A.3d 1085, 1093 (Pa. Super. 2023), *citing Rhodes*, 510 A.2d at 1227 n.14.

A parent-child relationship, in and of itself, is not sufficient to support a finding of forcible compulsion. *See Commonwealth v. Titus*, 556 A.2d 425, 429-30 (Pa. Super. 1989) (evidence insufficient for rape in case involving a single incident of sexual intercourse not precipitated by any physical or psychological force). Additional factors may be relied on in those situations to support a finding of forcible compulsion. For instance, a pattern of continuing physical abuse or past threats of physical force can be reasoned to have prevented the child victim's resistance in a way that sustains the element of forcible compulsion or the threat of forcible compulsion. *See Commonwealth v. Stambaugh*, 512 A.2d 1216, 1218 (Pa. Super. 1986) (forcible compulsion established by fourteen-year-old victim's testimony that the defendant stepfather, "hit" her "lots of times," that he would do so if she refused to have sex, and the past experiences with her stepfather and his threats prevented her resistance).

The most relevant case for purposes our review of the instant case is *Banniger*, in which this Court held that "evidence that a victim is unable to move out of fear of a defendant can be sufficient to prove forcible compulsion." 303 A.3d at 1090. In that case, the defendant started inappropriately touching a familial victim, J.Z., when she was just ten years old, first over her clothes and later underneath the clothes. *Id.* After a period of one year during which the victim moved out of the state and returned when she was fifteen years old, Banniger proceeded to sexually assault J.Z. on two occasions. *Id.* In each incident, the contact was initiated while J.Z. was sleeping. *Id.* In the first incident, J.Z. woke up to find her shorts pulled to the side with Banniger with his head between her legs with his tongue on and in her vagina. *Id.* In the second incident, J.Z. awoke to find her clothes to the side and Bannier's tongue again in her vagina. *Id.* Banniger then pulled J.Z.'s pants off and penetrated J.Z.'s vagina with his penis. *Id.* The victim maintained that she was "frozen in fear" and "just let it happen to [her] because [she] didn't know what else to do." *Id.* This Court held that the evidence in the second incident was sufficient for forcible compulsion based on the combination of the familial relationship with the defendant, the prior abuse committed by the defendant against the victim, and the testimony that she was frozen with fear during the incident. *Id.* ("Given that Banniger was an adult in J.Z.'s extended family, who had previously abused her, J.Z.'s testimony that she was frozen with fear during this incident was sufficient to

allow the trial court to conclude that Banniger forcibly compelled J.Z. to submit to sexual intercourse against her will.").

In the instant case, Appellant's victim was two years younger than the victim in *Banniger*, there is a father/daughter relationship involved, and there were multiple instances of sexual abuse, starting with the incident at the campground. As opposed to describing herself as "frozen" during the abuse like the victim in *Banniger*, Appellant's victim, L.L., used the word "shock" to describe her condition during the campground incident. N.T. 10/21/21, 84 ("I just like laid there in shock, like, thinking it was a dream. It hadn't really hit me what was happening. So I just laid there until it was over … I didn't know who it was at first and I was scared. I didn't know what else was going to happen."). During the ensuing incidents of sexual abuse at the family home, L.L. described herself assuming a planking position and trying to create the impression that she was asleep. N.T. 10/21/21, 88-90. The implication of this behavior, in context of the original "shock," was that she feared worse treatment if Appellant knew that she was awake. As she noted in her testimony, "I didn't want the person to know that I was awake because I didn't know what else they would do." N.T. 10/21/21, 92.

L.L. also described a pattern of violence by Appellant against her and her sibling, preceding the sexual abuse in this case. In particular, she noted an incident where he cursed at her, grabbed her by her shoulder, and slammed her into a closet door. N.T. 10/21/21, 117-118. She also noted an incident

where Appellant punched her younger brother in the back and an occasion where Appellant threw a toolbox drill and L.L. dived in front of her baby brother, to prevent him from getting hit with it, and the drill hit her side after it bounced off a coffee table. *Id.* at 119-122.

Viewing the combination of the addressed circumstances in the light most favorable to the Commonwealth, including the streak of nighttime sexual abuse of the child victim as she was initially shocked and continued to maintain the ruse that she was asleep during subsequent sexual abuse incidents as a result of fear and the prior violence exhibited by Appellant in the home, the evidence supported the notion that a combination of physical, intellectual, moral, emotional, and psychological forces compelled the victim to submit to intercourse against the her will. Consistent with ***Banniger***, the evidence sustained Appellant's convictions for rape by forcible compulsion and rape by threat of forcible compulsion.

While making his argument that the Commonwealth failed to produce sufficient evidence of the existence of forcible compulsion or a threat of forcible compulsion, Appellant segues to an argument that the evidence was insufficient for his intent to commit forcible compulsion or threaten forcible compulsion because he thought the victim was asleep. Appellant's Brief at 51. In doing so, he appears to be alluding to the affirmative defense of mistake of fact, without citation to the relevant defense statute at 18 Pa.C.S. § 304, and suggesting that the Commonwealth did not offer any evidence to

rebut that affirmative defense. This argument fails to address the fact that a defendant bears the burden to prove an affirmative defense by a preponderance of the evidence, *see Commonwealth v. Mouzon*, 53 A.3d 738, 743 (Pa. 2012), and Appellant never raised the defense at trial. Instead, the defense below appears to have been that the victim fabricated the events of the sexual abuse and the forensic evidence could have been explained by inadvertent transference of his semen to the victim's bedsheet. Because Appellant never raised the affirmative defense of mistake of fact, the Commonwealth had no burden to disprove the defense.[6] In turn, we cannot find that the evidence was insufficient because the Commonwealth did not rebut an affirmative defense that was never raised. Rather, we must find the argument to be waived. *See Commonwealth v. Wanner*, 158 A.3d 714, 717 (Pa. Super. 2017) (holding that Wanner waived her argument alleging that there was an affirmative defense to defiant trespass that was applicable to her case, where she failed to raise that defense in the trial court).

_____

[6] Had Appellant raised this mistake of fact defense theory at trial, he essentially would have admitted that his commission of the sexual acts against L.L. had occurred. *See Commonwealth v. White*, 492 A.2d 32, 35-36 (Pa. Super. 1985) ("An affirmative defense is one where the defendant admits his commission of the act charged, but seeks to justify or excuse."). In these circumstances, the pleading of a mistake of fact defense concerning whether the victim had been asleep to negate the necessary intent for rape under 18 Pa.C.S. § 3121(a)(1)-(2) would have conversely admitted that Appellant was guilty for rape of an unconscious person pursuant to 18 Pa.C.S. § 3121(a)(3).

In a sufficiency challenge to his unlawful contact conviction, Appellant alleges that the evidence failed to sustain that he had contact with the victim "in the way that term was intended to mean by the legislature in 18 Pa.C.S. § 6318." Appellant's Brief at 54. He argues that there was insufficient evidence of contact where there were no verbal communications between him and the victim during the assaults. *Id.* He argues that a prior panel of this Court in *Commonwealth v. Velez*, 51 A.3d 260 (Pa. Super. 2012), improperly expanded Section 6318's definition of contacts to include physical communications, that *Velez* is contrary to prior precedent, and that this Court should either reject *Velez* upon reversing the order on appeal or, at a minimum, recommend that this case should receive *en banc* consideration. *Id.* at 56-64.

Section 6318 of the Crimes Code defines unlawful contact with a minor, in pertinent part, as follows:

> **(a)** **Offense defined.**--A person commits an offense if the person is intentionally in contact with a minor, or a law enforcement officer acting in the performance of duties who has assumed the identity of a minor or of another individual having direct contact with children, as defined under 23 Pa.C.S. § 6303(a) (relating to definitions), for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth:
>
> > (1) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses).
> >
> > …

> **(c)  Definitions.**--As used in this section, the following words and phrases shall have the meanings given to them in this subsection:
>
> …
>
> **"Contacts."** Direct or indirect contact or communication by any means, method or device, including contact or communication in person or through an agent or agency, through any print medium, the mails, a common carrier or communication common carrier, any electronic communication system and any telecommunications, wire, computer or radio communications device or system.

18 Pa.C.S. § 6318(a)(1), (c).

In ***Velez***, we addressed the type of communication or contact necessary to sustain an unlawful contact conviction. There, a woman found the defendant molesting her daughter, who was "lying on the bed, nude from the waist down, with her knees up and defendant's head between her legs." ***Velez***, 51 A.3d at 262. Like Appellant in the instant case, Velez argued that he did not contact the victim through a communicative message and that his physical touching of the victim, by itself, was not the type of contact contemplated by the unlawful contact statute. We found the evidence sufficient for unlawful contact by concluding that, despite the lack of evidence of overt verbal communication, it was reasonable to infer that the defendant communicated with the victim, either nonverbally or verbally, to assume the position in which she was found by her mother. ***Id.*** We also explained that "[t]he victim would not have had her pants removed and her legs in that position absent previous contact by [the defendant], either verbal or physical."

*Id.* Accordingly, we held that there was sufficient evidence for indecent contact in *Velez* because it was "reasonable to infer that [the defendant] directed the victim, either verbally or nonverbally, to unclothe below the waist and to assume that pose." *Id.*

In the instant case, Appellant initiated the sexual abuse at times when L.L. had been asleep. During the incidents at the victim's home, she recalled that, when she woke to Appellant touching her vagina, her bottoms and underwear clothing had been removed off her. *See* N.T. 10/21/21, 90-91, 95, 180-181. L.L. also remembered a moment during the abuse when Appellant separated her legs with his foot. N.T. 10/22/21, 18, 37. The separation and repositioning of her legs was clearly meant to facilitate Appellant's sexual activity with L.L. Viewing the repositioning of L.L.'s legs and the removal of her clothing in the light most favorable to the Commonwealth, it was reasonable to infer here that Appellant communicated with the victim, through nonverbal contact, for the purpose of exposing her and placing her in a position for Appellant to assault her. *See Velez*, 51 A.3d at 262. At a minimum, Appellant's separation of the victim's legs with his foot was a physical communication with the victim directing her to spread her bare legs to allow him to proceed with intercourse with her, thereby constituting unlawful contact for sufficiency purposes. *See Commonwealth v. Copeland*, 2022 WL 3909024, *5 (Pa. Super., filed Aug. 31, 2022) (finding evidence sufficient for indecent contact where the evidence showed that

Copeland removed clothing from and repositioned his five-year-old victim on her stomach to engage in anal intercourse with her) (unpublished memorandum cited for persuasive value pursuant to Pa.R.A.P. 126(b)(2)).

In the first of two claims related to the admission of evidence at trial, Appellant challenges the admission of the prior bad acts evidence which included prior acts of violence or physical abuse against L.L. and her sibling that proceeded the sexual abuse. Brief for Appellant, 35-40. He acknowledges that, pursuant to our Supreme Court's decision in *Commonwealth v. Dillon*, 925 A.2d 131 (Pa. 2007), prior acts of physical abuse by a defendant may be admissible to explain a child victim's lack of prompt complaint in a sexual abuse case. Appellant's Brief at 35-36. He argues that the prior bad act evidence in the instant case should not have been admitted based on *Dillon* because the delay in reporting in that case was four years and the sexual abuse in this case was only alleged to have occurred over a two-week period and the victim reported the abuse days after the last alleged incident of abuse. Appellant's Brief at 36-38. He also attempts to distinguish *Dillon* on the basis that the victim in that case only reported the abuse after Dillon moved away from his victim whereas L.L. reported the abuse of her while Appellant was still living with her, and that the physical abuse in *Dillon* involved a greater degree of violence. Appellant's Brief at 37-38. Assuming *arguendo* that we do not agree with Appellant on his attempt to distinguish *Dillon* as support for the admission of the prior bad acts

evidence in the instant case, Appellant argues that the prior bad acts evidence should not have been admitted because its probative value was outweighed by its potential for unfair prejudice. Appellant's Brief at 39-40.

Upon considering challenges to the admissibility of evidence, we apply an abuse of discretion standard. *Commonwealth v. Gonzalez*, 112 A.3d 1232, 1236 (Pa. Super. 2015) (citation omitted). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." *Dillon*, 925 A.2d at 136, *citing Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003).

Generally, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). "Evidence of separate or unrelated 'crimes, wrongs, or acts,' however, has long been deemed inadmissible as character evidence against a criminal defendant in this Commonwealth as a matter not of relevance, but of policy, *i.e.*, because of a fear that such evidence is so powerful that the jury might misuse the evidence and convict based solely upon criminal propensity." *Dillon*, 925 A.2d at 137. Evidence of prior physical abuse to explain a child victim's lack of prompt complaint in a sexual offense case does not fall under any enumerated statutory exception to Rule 404(b)(1) that is identified in

Pa.R.E. 404(b)(2). The listed exceptions at Rule 404(b)(2), however, are not exhaustive and the Courts of this Commonwealth have recognized a *res gestae* exception to Rule 404(b) which allows admission of other crimes evidence when relevant to furnish the content or complete story of the events surrounding a crime. **Dillon**, 925 A.2d at 137, **citing Commonwealth v. Williams**, 896 A.2d 523, 539 (Pa. 2006), and **Commonwealth v. Paddy**, 800 A.2d 294, 307-08 (Pa. 2002).

In **Dillon**, the defendant was convicted of sexually assaulting a child "for nearly four years between 1995 and 1998[.]" **Dillon**, 925 A.2d at 133. The sexual assaults were not reported until 2001. **Id.** At trial, the Commonwealth introduced evidence that the defendant had physically abused the victim's mother and brother to explain the victim's delay in reporting the sexual abuse. **Id.** On appeal, our Supreme Cour held that it was permissible for the Commonwealth to present this evidence under Rule 404(b). **Id.** at 139-42. Specifically, the Court determined that the evidence was "relevant for purposes other than to show [Dillon's] bad character and criminal propensity." **Id.** at 139.

In the course of finding the physical abuse evidence admissible in **Dillon**, the Supreme Court noted that under 18 Pa.C.S. § 3105, "[a] jury may consider evidence of a lack of prompt complaint in cases involving sexual offenses." **Id.** at 137. The Court explained:

> Section 3105 codified a common law principle that the victim of a sexual assault naturally would be expected to complain of the

- 27 -

assault at the first safe opportunity. Generally, there are three principles upon which evidence addressing the timeliness of a sexual assault complaint has been deemed relevant and admissible: (1) as an explanation of an inconsistency/silence; (2) as corroboration of similar statements; or (3) as a *res gestae* declaration.

*Dillon*, 925 A.2d at 137 (citations omitted). The Court also noted:

[B]oth the common law experience and the judgment of the General Assembly have led to a recognition of the relevance of the promptness of a complaint of sexual abuse, and this Court has separately recognized the reality that a sexual assault prosecution oftentimes depends predominately on the victim's credibility, which is obviously affected by any delay in reporting the abuse. Revealing the circumstances surrounding an incident of sexual abuse, and the reasons for the delay, enables the factfinder to more accurately assess the victim's credibility. Moreover, this Court has acknowledged that juries in sexual assault cases expect to hear certain kinds of evidence and, without any reference to such evidence during the trial, a jury is likely to unfairly penalize the Commonwealth, the party with the burden of proof.

*Id.* at 138-39 (citations omitted).

In accordance with this analysis, our Supreme Court concluded that the prior physical violence evidence in *Dillon* was admissible where it "tend[ed] to show that [the victim's] experiences with [Dillon], including those assaults on family members, caused her to fear making a prompt report[,]" and was "relevant for *res gestae* purposes, *i.e.*, to explain the events surrounding the sexual assaults." *Id.* at 139.

The trial court's admission of the prior physical abuse in the instant case appears to have been fully consistent with the rationale and holding in *Dillon* and Appellant's attempt to distinguish the instant case from *Dillon* is unpersuasive. *Dillon* did not suggest that the admissibility of the evidence at

issue hinged on the extended duration of the delay in the reporting of the sexual abuse in that case. It merely noted that the prior abuse was "particularly relevant given both the lengthy period of alleged sexual abuse and the long delay in reporting the abuse." *Id.* at 139. On the contrary, the Supreme Court's acknowledgement that a sexual abuse victim's credibility is "obviously affected by **any delay** in reporting the abuse," *id.* at 139 (emphasis added), suggests that prior physical violence evidence may be admissible to explain any delay in the reporting of sexual abuse where a victim may have had opportunities to safely report the abuse. Accordingly, the holding in **Dillon** would still apply with equal reasoning in the instant case where the abuse was reported weeks after the first instance of sexual abuse and days after the last instance of abuse.

Our reading of **Dillon** also does not persuade us to disregard the holding of that case because the prior physical abuse in that case may have exceeded the prior physical abuse in this case by a matter of degree. In **Dillon**, the prior physical abuse evidence entailed that the victim's mother and younger brother were subject "to regular physical abuse," and, in one incident, Dillon broke the younger brother's leg. 925 A.2d at 133. In the instant case, the prior physical abuse evidence included abuse of both the victim, L.L., and her younger brother, and an instance where Appellant threw a drill in the presence of L.L.'s mother and it ultimately struck L.L. N.T. 10/21/21, 117-123. The physical violence in the instant case is obviously more relevant for

- 29 -

admissibility purposes than the physical abuse in *Dillon* because it involved the mistreatment of the actual victim of the reported sexual abuse, in addition, to abuse of other family members of the victim. At the same time, the physical abuse in both cases was relevant to a determination on a lack of a prompt complaint of sexual abuse because the events likely caused fear in the child victims and affected them from promptly reporting their abuse. Moreover, the prior physical abuse created an environment where the sexual abuse was enabled by the physical violence because it made the victims submit to the sexual abuse and temporarily silenced them due to the fear caused by the physical abuse.[7]

Having concluded that the physical abuse evidence was relevant and admissible pursuant to *Dillon*, we must next turn to Appellant's suggestion

---

[7] While arguing that the prior physical abuse evidence was not relevant to a lack of a prompt complaint in the case, Appellant notes, "the complainant herself never claimed to have delayed her reporting of the sexual abuse due to any fear of Appellant engendered by the alleged domestic violence." Appellant's Brief at 38. This point does not alter our application of the *Dillon* case to the instant matter. While testifying about the prior physical abuse instance where Appellant grabbed L.L., L.L. was asked whether she said anything about the resulting injury from that abuse to Appellant. N.T. 10/21/21, 118. Her response was, "I didn't want to get hit by him or something like that similar happen [sic]." *Id.* The reasonable inference from this testimony was that the shoulder-grabbing event engendered a subjective fear in L.L. of Appellant and the additional harm he would potentially cause her by challenging his physical abuse of her. It also naturally follows that if L.L. would not take issue with Appellant about the prior physical abuse, she would also not raise a concern about the subsequent sexual abuse. This testimony amply supports the relevance of the physical abuse evidence for purposes of this admissibility claim.

that the evidence should have been ruled inadmissible due to unfair prejudice "because such evidence palpably painted [him] as a person of unsavory character." Appellant's Brief at 39. "'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartiality." *Dillon*, 925 A.2d at 141, *citing* Pa.R.E. 403 cmt. Further,

> Evidence will not be prohibited merely because it is harmful to the defendant. This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged. Moreover, we have upheld the admission of other crimes evidence, when relevant, even where the details of the other crime were extremely grotesque and highly prejudicial.

*Dillon*, 925 A.2d at 141 (citations and quotation marks omitted). "Additionally, when examining the potential for undue prejudice, a cautionary instruction may ameliorate the prejudicial effect of the proffered evidence … Jurors are presumed to follow the trial court's instructions." *Commonwealth v. Tyson*, 119 A.3d 353, 360 (Pa. Super. 2015) (*en banc*) (citation omitted).

Here, the trial court did not abuse its discretion in concluding that the probative value of the evidence outweighed any prejudice to Appellant because the prior physical violence evidence was admitted only for the limited purpose of explaining the delay in the disclosure of the sexual abuse and that limited purpose along with a warning that the evidence should not be

considered as proof of any bad character or criminal tendency of Appellant was conveyed to the jury in the following instruction:

> You have heard evidence tending to prove that Defendant was guilty of improper conduct for which he is not on trial. I am speaking of the testimony to the effect that he was physically abusive to [L.L., her brother, and her mother]. This evidence is before you for a limited purpose; that is, for the purpose of tending to explain the delay in disclosure of sexual abuse by [L.L.] This evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence as showing that the Defendant is a person of bad character or criminal tendencies for which you might be inclined to infer guilt.

N.T. 10/26/21, 177-78. This cautionary instruction ameliorated the prejudicial impact of the prior physical violence evidence. *See Commonwealth v. Hairston*, 84 A.3d 657, 666, 671 (Pa. 2014) (holding extraneous offense of arson was admissible under Rule 404(b) as *res gestae* in prosecution for murder; trial court's instruction on how arson evidence should be considered minimized likelihood that arson evidence would inflame jury or cause it to convict defendant on improper basis).

Having determined that the prior physical abuse evidence was admissible pursuant to *Dillon*, and that the prejudicial effect of that evidence was properly limited by a cautionary limitation, we find that the trial court did not abuse its discretion in permitting the Commonwealth to present that evidence in its case-in-chief.

In his last claim, Appellant asserts that the trial court erred and abused its discretion by not allowing him to present additional forensic evidence and

cross-examine the Commonwealth's witnesses about "DNA collection and testing indicating the presence of sperm not from Appellant and DNA of males other than Appellant found on the [victim's] clothes and bedclothes." Appellant's Brief at 41-48. He notes that "[t]he trial court granted the Commonwealth's motion to preclude this evidence because the defense did not file a written motion to pierce the Rape Shield Law[8] and because past sexual conduct by the [victim] would be suggested by the intended questions and evidence." *Id.* at 42, *citing* N.T. 10/21/23, 23. The trial court precluded Appellant's attempt to admit the additional forensic evidence and pursue related cross-examination of the Commonwealth's witnesses because Appellant did not file a written motion required by 18 Pa.C.S. § 3104(b) and the "inescapable conclusion of stating to the [j]ury that sperm [from someone other than Appellant] was found in [L.L.'s] pajamas is that she was sexually active with a male other than this Defendant." N.T. 10/21/21, 18-24.

On appeal, Appellant argues that the applicable version of the Rape Shield Law

> did not require [him] to file a motion to pierce the Rape Shield because [(]1) the defense did not intend to offer any evidence of the [victim's] sexual conduct and [(]2) to the extent that evidence of the samples in any way implicated sexual acts it suggested only victimization, since the [victim] was a minor and could not legally consent to sexual conduct, and victimization did not fall within the purview of the prior version of the statute.

---

[8] The Rape Shield Law is a reference to 18 Pa.C.S. § 3104. The present version of this statute became effective following the commission of Appellant's offenses.

Appellant's Brief at 44. On that basis, he asserts that the court erred by requiring him to file a motion to pierce the Rape Shield Law and, as a result of the trial court's application of the more recent version of the Rape Shield Law, he was caused "to forgo invaluable supportive evidence for the defense theories of laboratory bias and sperm/DNA transference." *Id.* Additionally, Appellant argues that the Rape Shield Law should not have precluded his counsel from cross-examining the Commonwealth's expert witnesses about a recovered blood sample "or about DNA material generically." *Id.* at 47. He also argues that the trial court's application of the Rape Shield Law prejudiced him "because, even though the defense was still able, to some extent, to present arguments related to contamination and transference, the addition of the proffered evidence could have had a profound effect on the jury, as demonstrated by the jury's request to review the DNA reports and studies on transference." *Id.* at 48.

At the time of Appellant's crimes, the Rape Shield Law provided as follows:

> **(a)** **General Rule.--**Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

> **(b) Evidentiary proceedings.--**A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S § 3104 (prior version effective before August 27, 2019). In between the commission of Appellant's crimes and his trial, those subsections were amended as follows:

> **(a) General rule.--**Evidence of specific instances of the alleged victim's past sexual conduct, *past sexual victimization, allegations of past sexual victimization,* opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions of any offense listed in subsection (c) except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

> **(b) Evidentiary proceedings.--**A defendant who proposes to offer evidence of the alleged victim's past sexual conduct, *past sexual victimization, allegations of past sexual victimization,* opinion evidence of the alleged victim's past sexual conduct and reputation evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S. § 3104(a)-(b) (version effective starting on August 27, 2019; emphasis added to relevant new portions of the amended version). An added subsection (c) to Section 3104 provides that this statute applies to prosecutions relating to sexual offenses charged under Chapter 31 of the Crimes Code. *See* 18 Pa.C.S. § 3104(c).

The Commonwealth argues that the instant claim is unreviewable due to Appellant's failure to file a written motion pursuant to 18 Pa.C.S. § 3104(b). Appellee's Brief at 13. In the alternative, the Commonwealth asserts that the Rape Shield Law applied to preclude the admission of evidence and questioning of witnesses concerning sperm, from someone other than Appellant, on the victim's pajama pants and blood, containing a DNA mixture from someone other than Appellant and the victim, on the victim's bedsheets, because that evidence implicated the victim's past sexual conduct. *Id.* at 14-15.

At the outset, we must address whether Appellant's failure to file a motion to "pierce" the Rape Shield Law precludes our review of the instant claim. Undoubtedly, no such motion was filed. There is no docket entry for a related motion and no such motion appears in the certified record. Appellant maintains on appeal, as he did below, that the Rape Shield Law did not require him to file a written motion because the evidence at issue only suggested the victimization of L.L., given her age at the time, and the pre-August 27, 2019 version of the Rape Shield Law did not apply to victimization like the current

version of the statute. Appellant's Brief at 44 ("victimization did not fall within the purview of the prior version of the statute"); N.T. 10/21/21, 5-6 (related argument below).

To properly account for Appellant's requirement to file a motion required by the Rape Shield Law, we must first focus on Appellant's initial assertion that the trial court committed an *ex post facto* violation by applying the present version of the statute. **See** Appellant's Brief at 42-43. Appellant's sole legal support for this assertion is a citation to this Court's unpublished memorandum in **Commonwealth v. Negron**, 2018 WL 4705813 (Pa. Super., filed Oct. 2, 2018). Appellant's Brief at 42-43. There are multiple problems with Appellant's use of **Negron** alone to support his point.

First, because the unpublished decision in **Negron** was issued prior to May 1, 2019, we may not even it consider for purposes of persuasive value. **See** Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed **after** May 1, 2019, for persuasive value). Second, reliance on **Negron** for the purpose Appellant refers to it is slightly misleading. Appellant cites that case for the proposition that "A law is *ex post facto* when, *inter alia*, it alters the legal rules of evidence, and requires less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender." Appellant's Brief at 43-44. In referring to **Negron** for that purpose, Appellant is alluding to that case's citation of the United States Supreme Court's four-prong *ex post facto* standard set forth in **Calder**

***v. Bull***, 3 U.S. 386, 390 (1798) (stating among the categories of laws that violate *ex post facto* prohibitions: "4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender."). ***Negron***, 2018 WL 4705813, *8. ***Negron*** – assuming it could even be a useable citation for Appellant – applied an entirely different prong of the ***Calder*** standard for an *ex post facto* claim concerning retroactive application of the sexual offender registration requirements.

Properly viewing our citable caselaw on the relevant prong of the ***Calder*** standard does not support Appellant's assertion that application of the 2019 version of the Rape Shield Law constituted an *ex post facto* violation. In ***Commonwealth v. McElhenny***, 478 A.2d 447 (Pa. Super. 1984), a defendant argued that the admission of a tape recording of a 911 telephone call made by himself in which he made incriminating statements violated the *ex post facto* clauses of the United States and Pennsylvania Constitutions. Under the law at the time the call was recorded, the recording, although legally made, could not be used as evidence in court, absent the defendant's written consent. By the time of trial, however, that law had been repealed, and a new law, under which the recording was admissible irrespective of defendant's consent, was in effect. In rejecting McElhenny's *ex post facto* claim, we acknowledged that the law in question altered the legal rules of evidence to allow the admission of different evidence, but emphasized that the law

did not alter the evidence necessary to *convict* the offender. That is, it did not change the legal definition of the crime; it did not change the prohibited behavior or what the state had to show to prove commission of the crime. That must be the focus of our enquiry and it did not occur here.

*Id.* at 449 (internal citation omitted, emphasis in original).

*McElhenny* suggests that the 2019 amendment to the Rape Shield Law did not constitute an *ex post facto* violation under the fourth prong of the *Calder* standard because it did not change the legal definition of Appellant's crimes, it did not change the prohibited behavior which was the basis for his convictions, and did not change what the state had to show to prove the commission of the crime. Accordingly, the change did not fall within the fourth *Calder* category. That the change disadvantaged Appellant is alone insufficient to prove an *ex post facto* violation. As our Supreme Court noted in *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017), "[o]nly those laws which disadvantage a defendant **and** fall within a *Calder* category are *ex post facto* laws constitutionally infirm." 164 A.3d at 1196, *quoting Commonwealth v. Young*, 637 A.2d 1313, 1318 (Pa. 1993) (emphasis in original). A proper assessment of caselaw addressing the treatment of the fourth *Calder* category does not align with Appellant's brief *ex post facto* argument relying on a single unpublished memorandum which may not be cited even for persuasive support. *See Commonwealth v. Newman*, 633 A.2d 1069, 1071 (Pa. 1993) (holding that the application of a new rule governing spousal privilege at a coroner's inquest which occurred after

statute's effective date was not an *ex post facto violation;* "the law was not *ex post facto* because it did not criminalize a previously innocent act, it did not enhance a crime previously committed, and it did not change the proof needed to obtain a conviction"), **citing Hopt v. Utah**, 110 U.S. 574, 589 (1884) ("alterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt … *relate to modes of procedure only*, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure."). (emphasis added). **Accord Pilcher v. Commonwealth**, 583 S.E.2d 70, 75 (Va. App. 2003) (holding that application of an amended version of the Virginia Rape Shield Law in a case where the crimes were committed prior to that amendment did not constitute an *ex post facto* violation).

In the absence of relevant briefing by the parties on the issue of whether the application of the 2019 amended version of the Rape Shield Law was an *ex post facto* violation, we are reluctant to simply rest on the fact that our independent research suggests that the application of the present version of the statute was not an *ex post facto* violation.[9] **See, e.g., Commonwealth v. Westfall**, 2022 WL 2733267, *4 (Pa. Super., filed July 14, 2022) (finding argument that the application of the 2019 amendment to the Rape Shield Law

---

[9] In addition to the fact that Appellant's brief *ex post facto* argument lacked any citeable legal support, we also note that the Commonwealth's brief completely sidesteps Appellant's argument to that effect and never directly addresses it.

constituted an *ex post facto* violation was waived for lack of development) (cited for persuasive value pursuant to Pa.R.A.P. 126(b)(2)).  Instead, we note that, even if we accept Appellant's premise that the prior version of the Rape Shield Law should have applied, we still do not recognize a basis for relief.

Appellant is correct that the prior version of Section 3104 that was effective at the time of his crimes would not bar the admission of evidence regarding a prior sexual assault suffered by L.L.  **See Commonwealth v. Johnson**, 638 A.2d 940, 941-942 (Pa. 1994) (stating that "[t]o be a victim is not 'conduct' of the person victimized."); **id.** (stating that where the Rape Shield Law does not apply, the evidence must be evaluated under the traditional rules of evidence).  However, "[i]f the offer of proof shows only that others in addition to the defendant had sexual conduct with the victim, but does not show how the evidence would exonerate the defendant, evidence of prior sexual activity is inadmissible under the Rape Shield Law." **Commonwealth v. Fink**, 791 A.2d 1235, 1242-43 (Pa. Super. 2002). Moreover, proffers under the Rape Shield Law must not be vague or conjectural.  **See Fink**, 791 A.2d at 1241.

Here, we are unable to discern an abuse of discretion by the trial court concluding that the Rape Shield Law applied to the additional forensic evidence at issue and that Appellant's failure to file a written motion required by Section 3104(b) precluded him from seeking admission of the evidence and pursuing cross-examination about it.  "The purpose of the Rape Shield statute is to

- 41 -

prevent a trial from shifting its focus away from the culpability of the accused towards the virtue and chastity of the victim." **Commonwealth v. Guy**, 686 A.2d 397, 400 (Pa. Super. 1996). In this instance, Appellant made no proffer that the evidence in question was the result of prior victimization of L.L. such that the inapplicability of the Rape Shield Law was apparent. Namely, it was possible that the forensic evidence at issue was placed on the victim's pajama pants and bedsheet through consensual sexual conduct with a similarly-aged male peer, which would not entail an act of victimization. **See, e.g., In re B.A.M.**, 806 A.2d 893, 897-898 (Pa. Super. 2002) (holding that an eleven-year-old could not be adjudicated delinquent for the offenses of rape and involuntary deviate sexual intercourse based on consensual acts with another 11-year-old; "we find that the Legislature did not intend to criminalize consensual sexual activity between peers" who are minors). In the absence of any apparent support suggesting that the additional forensic evidence at issue was the proof of victimization, the evidence should have been regarded as evidence of the victim's past sexual conduct to which the Rape Shield Law applied and required Appellant to file a written motion to pursue admission of that evidence.

Appellant's counsel erred by assuming that any sexual conduct involving L.L. would necessarily constitute illegal activity given her age. **See** N.T. 10/21/21, 5-6 ("because [L.L.] would have been 13 at the time, anything with her consensual or not would have been illegal under the law in the state of

Pennsylvania and therefore, falling into that victimization category, which was specifically not included in the statute at the time of the incident."). Counsel's broad assertion that the age of the victim must have dictated that the additional forensic evidence at issue in this claim was *per se* proof of victimization demonstrates a lack of consideration of our decision in **B.A.M.** In the absence of any proffer of past victimization of L.L., the admissibility of the additional recovered forensic evidence should have been addressed to the trial court in a written motion to pierce the applicability of the Rape Shield Law as required by Section 3104(b). **Commonwealth v. Beltz**, 829 A.2d 680, 684 (Pa. Super. 2003) (the failure to make a written motion required by Section 3104(b) is fatal to a claim of trial court error in the preclusion of evidence concerning a victim's past sexual conduct).

Even if Appellant had filed a written motion, we would not find that the trial court's exclusion of the additional forensic evidence and preclusion of related cross-examination were proof of an erroneous application of the Rape Shield Law that would constitute an abuse of discretion. "[W]hile the Rape Shield [L]aw must bow to the need to permit an accused an opportunity to present genuinely exculpatory evidence, the Rape Shield [L]aw nonetheless remains an effective limitation on abusive inquiries addressed to irrelevant personal matters which were formerly conducted to harass and defame the [victim] while distracting the jury from the legitimate issues involved in sexual assault cases." **Commonwealth v. Nieves**, 582 A.2d 341, 348 (Pa. Super.

1990). Appellant's counsel stated that their proposed intent with addressing the additional forensic evidence was "to explore why there might be a presence of [Appellant's] DNA … in [L.L.'s] bed along with other people's presence in that bed," *i.e.*, to support a theory that his semen ended up on the bed sheet through transference in the laundry or possibly through a laboratory contamination. N.T. 10/21/21, 7-12. The additional forensic evidence, however, would have only been relevant for those purposes if it indeed supported a theory for transference or contamination. In the absence of any proffer as to how that additional forensic evidence ended up on the victim's pajama pants and bedsheet, Appellant did not demonstrate any basis for that evidence making it more or less likely that there was a benign reason for the discovery of his own semen on the bedsheet. On that basis, the additional forensic material was irrelevant even if the Rape Shield Law were inapplicable to it.

Even if we could excuse Appellant's failure to file a written motion, his proffer for seeking admission of the additional forensic material was properly rejected as vague or conjectural. **See Fink**, 791 A.2d at 1243 (trial court did not abuse its discretion in precluding defendant from piercing the rape shield where his proffer was nothing more than "a vague suggestion that sexual activity was taking place between the victim and [an] unidentified male."). Given the minimal probative value of this evidence to advance Appellant's defense theory, and the high potential prejudice of such evidence, as a result

of its inevitable suggestion of promiscuity by the victim, we find no error in the trial court's exclusion of the evidence and related cross-examination.

Judgments of Sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/13/2024